**Julie D. HALVORSON, Respondent,**

v.

**B&F FASTENER SUPPLY and Selective Insurance Group, Relators.**

A16-0920

Supreme Court of Minnesota.

Filed: September 20, 2017

ments regarding the remedy to which Meger would be entitled if *Her* did apply retroactively to Meger's case.

Timothy J. McCoy, McCoy, Peterson & Jorstad, Ltd., Minneapolis, Minnesota, for respondent.

Elizabeth Chambers-Brown, Brown & Carlson, P.A., Minneapolis, Minnesota, for relators.

## OPINION

STRAS, Justice.

This appeal from the Workers' Compensation Court of Appeals (WCCA) requires us to determine when, and under what circumstances, an employer may terminate an employee's rehabilitation benefits. Relying on the definition of "qualified employee" in an administrative rule, the compensation judge concluded that an employee was no longer eligible for rehabilitation benefits because she had obtained "suitable gainful employment." *See* Minn. R. 5220.0100, subps. 22, 34 (2015). The WCCA reversed, holding that an employer must show "good cause" before terminating rehabilitation benefits. *Halvorson v. B&F Fastener Supply*, No. WC15-5869, 2016 WL 3251720, *6-7 (Minn. WCCA May 9, 2016) (citing Minn. Stat. § 176.102, subd. 8(a) (2016), and Minn. R. 5220.0510, subp. 5 (2015)). Because we agree with the WCCA that the compensation judge applied the wrong legal standard in granting the employer's petition to discontinue rehabilitation services, we affirm.

## FACTS

The relevant facts are undisputed. Respondent Julie Halvorson sustained an in-

jury to her right elbow and both knees while working for relator B&F Fastener Supply. A compensation judge awarded workers' compensation benefits to Halvorson, including rehabilitation services, which consisted of vocational assistance intended to return Halvorson to a job in her field or in another area that could "produce[ ] an economic status as close as possible" to her pre-injury employment. Minn. Stat. § 176.102, subd. 1(b) (2016). In accordance with the compensation judge's decision, B&F and its insurer, Selective Insurance Group (collectively "B&F"), paid for Halvorson's wage losses, treatment expenses, and rehabilitation services arising out of the injury. Halvorson eventually obtained part-time employment with another employer, which prompted B&F to seek the discontinuation of Halvorson's rehabilitation services.

B&F filed a request to discontinue rehabilitation services with the Workers' Compensation Division of the Department of Labor and Industry. *See* Minn. Stat. § 176.106 (2016). The request claimed that Halvorson was no longer a "qualified employee" entitled to receive rehabilitation benefits because she had returned to "suitable gainful employment" with another employer. *See* Minn. R. 5220.0100, subps. 22, 34 (defining "qualified employee" and "suitable gainful employment"). After the Workers' Compensation Division denied B&F's request, B&F requested a formal hearing before a compensation judge. *See* Minn. Stat. § 176.106, subd. 7(a).

At the outset of the hearing, B&F advised the compensation judge that the only two issues for decision were (1) "whether [Halvorson] is a qualified employee for rehabilitation services"; and (2) "whether she has returned to suitable gainful employment such that she would be precluded from receiving ongoing rehabilitation services." Halvorson agreed with B&F's statement and specifically noted that, under Minn. R. 1420.2150, subd. 2(c) (2015), the hearing was limited to the issues that B&F had raised in its request to the Workers' Compensation Division.

The compensation judge granted B&F's request, concluding that Halvorson was no longer a "qualified employee" in light of her part-time job, which had eliminated the need for further rehabilitation services. The WCCA, in reversing the compensation judge, declined to evaluate whether Halvorson's part-time job constituted "suitable gainful employment" or whether she continued to be a "qualified employee." *See Halvorson*, 2016 WL 3251720, at *7. Rather, the WCCA determined that every request to terminate rehabilitation services is subject to the "good cause" standard in Minn. Stat. § 176.102, subd. 8(a), and Minn. R. 5220.0510, subp. 5, neither of which the compensation judge considered in terminating Halvorson's rehabilitation benefits. *Id.* In light of the compensation judge's improper reliance on the definitional provisions of an administrative rule, Minn. R. 5220.0100, subps. 22, 34, and B&F's decision not to have its request evaluated under the "good cause" standard, the WCCA held that B&F was not entitled "to terminate [Halvorson's] rehabilitation benefits." *Id.* B&F now seeks review of the WCCA's decision by writ of certiorari.

## ANALYSIS

Our task in this appeal is to identify what legal standard governs a request to terminate rehabilitation benefits awarded to an employee as part of a compensable workers' compensation injury. Rehabilitation services are a vocational benefit to assist an injured employee in "return[ing] to a job related to the employee's former employment or to a job in another work area" that provides the employee with "an

economic status as close as possible to" what the employee would have had "without [the] disability." Minn. Stat. § 176.102, subd. 1(b). To receive rehabilitation services, an employee must first meet with a qualified rehabilitation consultant, who develops a plan for services if the "consultation indicates that rehabilitation services are appropriate." *Id.*, subds. 4(a), (e) (2016). If an employee is eligible to receive rehabilitation services, the compensation judge then approves, modifies, or rejects the plan developed by the qualified rehabilitation consultant. *Id.*, subd. 6(a) (2016). Following the approval and implementation of a plan for rehabilitation services, an employer or insurer may request the termination of the plan based on "a showing of good cause." *Id.*, subd. 8(a).

The parties disagree on the procedure for terminating rehabilitation services. B&F, consistent with the compensation judge's decision, argues that two definitional provisions—one defining "qualified employee," Minn. R. 5220.0100, subp. 22, and the other defining "suitable gainful employment," *id.*, subp. 34—permit the compensation judge to terminate rehabilitation services. Halvorson, who agrees with the WCCA's approach, views the good-cause standard, as defined in Minn. Stat. § 176.102, subd. 8(a), and Minn. R. 5220.0510, subp. 5, as the exclusive means for terminating a rehabilitation plan.

■■ Determining what legal standard applies to the termination of rehabilitation benefits presents a legal question that we review de novo. *Berglund v. Comm'r of Revenue*, 877 N.W.2d 780, 783 (Minn. 2016). When interpreting a statute, we give words and phrases their plain and ordinary meaning, *State v. Fleming*, 883 N.W.2d 790, 795 (Minn. 2016), and "read the statute as a whole and give effect to all of its provisions." *Conga Corp. v. Comm'r*

*of Revenue*, 868 N.W.2d 41, 46 (Minn. 2015).

## I.

We begin our analysis with the statute, Minn. Stat. § 176.102 (2016), which addresses the procedures for the initiation, implementation, and termination of "vocational rehabilitation of injured employees." Minn. Stat. § 176.102, subd. 1(a). Minnesota Statutes § 176.102, subd. 8(a), the plan-modification provision, specifically addresses the alteration, suspension, and termination of a rehabilitation plan:

> Subd. 8. Plan modification. (a) Upon request to the commissioner or compensation judge by the employer, the insurer, or employee, or upon the commissioner's own request, the plan may be suspended, terminated, or altered *upon a showing of good cause*, including:
>
> (1) a physical impairment that does not allow the employee to pursue the rehabilitation plan;
>
> (2) the employee's performance level indicates the plan will not be successfully completed;
>
> (3) an employee does not cooperate with a plan;
>
> (4) that the plan or its administration is substantially inadequate to achieve the rehabilitation plan objectives;
>
> (5) that the employee is not likely to benefit from further rehabilitation services.

(Emphasis added.) The plan-modification provision has at least two notable features.

First, in addition to saying *who* may modify a rehabilitation plan, it explains *what* may be modified. *See id.* According to the plan-modification provision, parties other than intervenors, and even the Commissioner of Labor and Industry, may ask a compensation judge to "suspend[ ]" or "terminate[ ]" a rehabilitation plan. *Id.*

These two verbs provide a clue about the scope of the plan-modification provision. Specifically, the definition of the word "terminate" is "to bring an end to or halt." *The American Heritage Dictionary of the English Language* 1796 (5th ed. 2011); *see also Webster's Third New International Dictionary* 2359 (2002) (defining "terminate" to mean "to form the ending or conclusion of"). Similarly, the word "suspend" means "to cause to stop for a period; interrupt" and "to render temporarily ineffective." *The American Heritage Dictionary of the English Language* 1755 (5th ed. 2011); *see also Webster's Third New International Dictionary* 2303 (2002) (defining "suspend" as "to cause ... to cease for a time" or to "stop temporarily"). These two verbs indicate that the plan-modification provision covers *existing* rehabilitation plans, not those that have yet to be approved or implemented, because it is not possible "to stop" or "bring an end to" something that has not yet started.

Second, the plan-modification provision explains *how* to modify an existing plan. It states that the individual or entity seeking modification must make "a showing of good cause." Minn. Stat. § 176.102, subd. 8(a). Rather than simply announcing the applicable standard, the plan-modification provision also provides a nonexclusive list of reasons for terminating rehabilitation services under the good-cause standard, including, as relevant here, "that the employee is not likely to benefit from further rehabilitation services." *Id.*, subd. 8(a)(5).

▆▆▆ B&F concedes that it could have relied upon the "good cause" standard to request the termination of Halvorson's rehabilitation benefits because its theory is essentially that Halvorson's return to part-time employment eliminates the need for further rehabilitation services. Yet rather than pursue this argument before the compensation judge, B&F disclaimed reliance on the plan-modification provision and urged the compensation judge to instead terminate Halvorson's rehabilitation plan under the definitional provisions of an administrative rule, Minn. R. 5220.0100, subps. 22, 34. Despite B&F's attempts to revive the argument now, its actions before the compensation judge, including its decision to withdraw its good-cause argument under the plan-modification provision, constitute waiver. *See Weitzel v. State*, 883 N.W.2d 553, 554 n.1 (Minn. 2016) ("[W]aiver is the intentional relinquishment or abandonment of a known right.").[1]

In an effort to litigate its core theory under other provisions, B&F argues that a number of different procedural options allow an employer to seek the termination or modification of a rehabilitation plan. One such option, according to B&F, is Minn. Stat. § 176.102, subd. 6(a), the plan-approval-or-rejection provision, which states as follows:

> The commissioner or a compensation judge shall determine eligibility for rehabilitation services and shall review, approve, modify, or reject rehabilitation plans developed under subdivision 4. The commissioner or a compensation judge shall also make determinations re-

---

1. B&F has also forfeited its argument that a separate administrative rule, Minn. R. 5220.0510, subp. 7A, permitted the compensation judge to terminate Halvorson's rehabilitation benefits. *See Weitzel*, 883 N.W.2d at 554 n.1 ("[F]orfeiture is the failure to make a timely assertion of a right...."). B&F raises this argument before us for the first time. Because we generally decline to consider questions "never litigated below," *Thiele v. Stich*, 425 N.W.2d 580, 582 (Minn. 1988), we do not decide whether Rule 5220.0510, subp. 7A, provides an independent basis for the termination of Halvorson's rehabilitation services.

garding rehabilitation issues not necessarily part of a plan including, but not limited to, determinations regarding whether an employee is eligible for further rehabilitation and the benefits under subdivisions 9 and 11 to which an employee is entitled.

In contrast to the plan-modification provision, the plan-approval-or-rejection provision addresses initial plan review by the Commissioner or a compensation judge. The provision itself provides some clues about its limited scope. First, among the statutory duties of the compensation judge or the Commissioner is to "determine eligibility for rehabilitation services" when presented with a rehabilitation plan from a qualified rehabilitation consultant, which occurs after the initial consultation between the injured employee and the qualified rehabilitation consultant. *Id.* In fact, the provision cross-references Minn. Stat. § 176.102, subd. 4, which addresses the "develop[ment]" of a rehabilitation plan and the submission of the plan to the Commissioner. Sequentially, the development and submission of a rehabilitation plan both occur before the Commissioner or compensation judge determines a claimant's initial eligibility for rehabilitation services.

Second, two of the verbs in the plan-approval-or-rejection provision, "approve" and "reject," make little sense in the context of an existing plan. Minn. Stat. § 176.102, subd. 6(a). "Approve" means "[t]o consent to officially or formally; confirm or sanction." *The American Heritage Dictionary of the English Language* 88 (5th ed. 2011); *see also Webster's Third New International Dictionary* 106 (2002) (listing "sanction" as a synonym of "approve"). And "reject," an antonym of "approve," means "[t]o refuse to consider or grant; deny." *The American Heritage Dictionary of the English Language* 1482 (5th

ed. 2011); *see also Webster's Third New International Dictionary* 1915 (2002) (defining "reject," in relevant part, as "to refuse to acknowledge, adopt, believe, acquiesce in, receive, or submit to"). Each of these verbs becomes redundant in the context of an existing rehabilitation plan that the Commissioner or a compensation judge has already approved. *See State v. Rick*, 835 N.W.2d 478, 483 (Minn. 2013) (rejecting an "interpretation [that] would render the statute redundant and . . . fail to give independent effect to every word in the statute").

■ If we were to accept B&F's interpretation, which would allow an employer to seek approval or rejection of an existing plan simply by filing a request, then the initial review contemplated by Minn. Stat. § 176.102, subd. 6(a), could occur into perpetuity and the plan-modification provision would become surplusage. *See State v. Struzyk*, 869 N.W.2d 280, 286 (Minn. 2015) (adopting an interpretation of a statute that avoided surplusage). No employer would proceed under the plan-modification provision if it could instead simply file a request under the plan-approval-or-rejection provision, which does not require the employer to make any showing at all, much less satisfy a good-cause standard. B&F's argument is further undermined by the fact that the trigger for the review contemplated by Minn. Stat. § 176.102, subd. 6(a), is the development of a rehabilitation plan and its submission to the Commissioner, not a request to terminate rehabilitation services.

B&F nevertheless contends that, even if the first sentence of the plan-approval-or-rejection provision focuses exclusively on the initial-eligibility determination, the second sentence, which discusses "further rehabilitation," allows a compensation judge to modify or terminate an existing rehabilitation plan. Minn. Stat. § 176.102, subd.

6(a). To be sure, the definition of the word "further," considered in isolation, could support B&F's interpretation that the plan-approval-or-rejection provision allows an employer to file a request to terminate future—that is, further—rehabilitation services. *See The American Heritage Dictionary of the English Language* 713 (5th ed. 2011) (defining "further" as both "[m]ore distant in degree, time, or space" and "[a]dditional"); *Webster's Third New International Dictionary* 924 (2002) (defining "further" as "going or extending beyond what exists: [a]dditional").

But when read in context, including the reference to "the benefits under subdivisions 9 and 11" in the second sentence, it is clear that the word "further" refers to the various *types* of rehabilitation services, such as those enumerated in Minn. Stat. § 176.102, subds. 9, 11, not to the availability of *future* rehabilitation services under an existing plan. *See State v. Nelson*, 842 N.W.2d 433, 437 n.2 (Minn. 2014) (stating "the basic principle that the relevant definition of a term depends on the context in which the term is used"). The second sentence, in other words, requires a compensation judge to consider all types of rehabilitation benefits when initially approving or rejecting a plan, even if they are "not necessarily part of [the rehabilitation] plan" developed by the qualified rehabilitation consultant. Minn. Stat. § 176.102, subd. 6(a). It does not provide, as B&F argues, a freestanding license for an employer to serially challenge a claimant's eligibility for rehabilitation services.

## II.

■ We now turn to the administrative rules promulgated by the Commissioner. According to B&F, when an individual receiving rehabilitation benefits finds "suitable gainful employment" and no longer meets the definition of a "qualified employ-ee," a compensation judge may terminate benefits without applying the good-cause standard. *See* Minn. R. 5220.0100, subps. 22, 34 (defining "qualified employee" and "suitable gainful employment"). We disagree.

Even though administrative rules "carry the force of law," *Berglund*, 877 N.W.2d at 784, B&F's reliance on these definitional provisions is misplaced. To prevail, B&F must show that these definitional provisions independently create a right to seek the termination of rehabilitation services. But neither provision does anything more than define technical phrases that appear elsewhere in the administrative rules. For example, Minn. R. 5220.0100, subp. 22, defines a "qualified employee" as:

an employee who, because of the effects of a work-related injury or disease, whether or not combined with the effects of a prior injury or disability:

A. is permanently precluded or is likely to be permanently precluded from engaging in the employee's usual and customary occupation or from engaging in the job the employee held at the time of injury;

B. cannot reasonably be expected to return to suitable gainful employment with the date-of-injury employer; and

C. can reasonably be expected to return to *suitable gainful employment* through the provision of rehabilitation services, considering the treating physician's opinion of the employee's work ability.

(Emphasis added.) Conspicuously absent from this provision is any mention of rehabilitation-plan modification or termination; the rights of employers or insurers; or even the compensation judge or Commissioner, whose involvement is necessary—as B&F concedes—to terminate Halvorson's rehabilitation services.

The definition of the phrase "suitable gainful employment" is even less helpful to

B&F. "Suitable gainful employment" is "employment which is reasonably attainable and which offers an opportunity to restore the injured employee as soon as possible and as nearly as possible to employment which produces an economic status as close as possible to that which the employee would have enjoyed without disability." Minn. R. 5220.0100, subp. 34. In addition to matching the lack of detail accompanying the definition of "qualified employee," the definition of "suitable gainful employment" does not even mention rehabilitation services, much less provide a mechanism for terminating them.[2]

To support its argument that the definitional provisions provide an independent mechanism for terminating rehabilitation services, B&F relies on the absurdity canon. *See State v. Smith*, 899 N.W.2d 120, 125 (Minn. 2017) (discussing the single instance in which we applied the absurdity canon, which allows a court "to override the plain and unambiguous language of a statute" in the rare instance when the result would be so absurd that it would "utterly depart from" the statute's purpose (citations omitted) (internal quotation marks omitted)). If a recipient of rehabilitation services is no longer a "qualified employee," B&F maintains, then it would be absurd to delay or prevent the termination of rehabilitation services. There are two basic flaws with B&F's argument.

First, the law is replete with examples of procedural requirements that litigants must satisfy before enforcing legal rights and obligations, from service-of-process requirements to evidentiary burdens. Here, the plan-modification provision requires an employer to file a request and then make "a showing of good cause" before terminating an employee's rehabilitation services. Minn. Stat. § 176.102, subd. 8(a). There is nothing absurd about creating a procedural framework for the modification of a rehabilitation plan, particularly one that allows the parties to litigate the question of termination and guards against the premature or erroneous termination of a recipient's rehabilitation benefits.

Second, B&F's argument erroneously assumes that requiring a showing of good cause is the equivalent of saying that the definitional provisions play no role in a decision to terminate rehabilitation services. What B&F fails to recognize, however, is that there is substantial overlap between the definition of "qualified employee" and the good-cause grounds for termination in the plan-modification provision. For example, an employee who "can[not] reasonably be expected to return to suitable gainful employment through the provision of rehabilitation services," Minn. R. 5220.0100, subp. 22, will also tend to be unlikely "to benefit from further rehabilitation services," Minn. Stat. § 176.102, subd. 8(a)(5). So too with respect to an employee who "is permanently precluded or is likely to be permanently precluded from engaging in the employee's usual and customary occupation," Minn. R. 5220.0100, subp. 22, which also may mean that the employee has "a physical impairment that does not allow the employee to pursue the rehabilitation plan," Minn. Stat. § 176.102, subd. 8(a)(1). Accordingly, the various statutes and administrative rules are part of a cohesive framework, and if a recipient of rehabilita-

---

**2.** Minn. R. 5220.0510, subp. 5, addresses requests for the closure of uncompleted rehabilitation plans. Like the plan-modification provision, the closure or suspension of an uncompleted plan is contingent on a showing of good cause. Because B&F has waived its argument that there is good cause for plan termination, however, we do not decide whether this rule would have provided an independent basis for the compensation judge's decision to terminate Halvorson's rehabilitation services.

tion services is no longer a "qualified employee," nothing prevents an employer or insurer from requesting the termination of rehabilitation services under one of the enumerated grounds in the plan-modification provision or on some other good-cause basis.

## CONCLUSION

For the foregoing reasons, we affirm the decision of the Workers' Compensation Court of Appeals.

Affirmed.